﻿Citation Nr: 18124200
Decision Date: 08/06/18 Archive Date: 08/06/18

DOCKET NO. 11-05 593
DATE: August 6, 2018
ORDER
Entitlement to service connection for heart disease other than atrial fibrillation with left ventricular hypokinesis is denied.
Entitlement to an initial rating in excess of 50 percent for posttraumatic stress disorder (PTSD) is denied.
Entitlement to an earlier effective date than June 13, 2012, for the grant of service connection for cataracts with mild retinopathy, right eye, is denied.
Entitlement to an earlier effective date of May 30, 2012, for the grant of a separate 30 percent evaluation for diabetic nephropathy as a complication of service-connected diabetes mellitus is granted.
FINDINGS OF FACT
1. The Veteran does not have a heart disease other than atrial fibrillation with left ventricular hypokinesis. 
2. The Veteran’s PTSD is not manifested by deficiencies in most areas.
3. The claim date for service connection for cataracts with mild retinopathy, right eye, is July 1, 2013.
4. The claim date for the separate 30 percent evaluation for diabetic nephropathy is May 30, 2012.
5. Entitlement to a 30 percent evaluation for nephropathy arose more than one year prior to the May 30, 2012, claim date. 
CONCLUSIONS OF LAW
1. The criteria for entitlement to service connection for heart disease other than atrial fibrillation with left ventricular hypokinesis have not been met. 38 U.S.C. §§ 1110, 1116 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2018).
2. The criteria for an initial disability rating in excess of 50 percent for service-connected PTSD have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 4.7, 4.130, Diagnostic Code (DC) 9411 (2018).
3. The criteria for an earlier effective than July 1, 2013, for the grant of service connection for cataracts with mild retinopathy, right eye, have not been met. 38 U.S.C. § 5110 (2012); 38 C.F.R. §§ 3.151, 3.155, 3.310, 3.400 (2018).
4. The criteria for an earlier effective date than June 13, 2012, for the grant of separate service connection for cataracts with mild retinopathy, right eye have not been met. 38 U.S.C. § 5110 (2012); 38 C.F.R. §§ 3.151, 3.155, 3.310, 3.400 (2018).
5. The criteria for an earlier effective date of May 30, 2012, for the grant of a separate 30 evaluation for diabetic nephropathy have been met. 38 U.S.C. § 5110 (2012); 38 C.F.R. §§ 3.151, 3.155, 3.310, 3.400 (2018).
REASONS AND BASES FOR FINDINGS AND CONCLUSIONS
The Veteran served on active duty from October 1963 to October 1966 with service in the Republic of Vietnam. This matter comes to the Board of Veterans’ Appeals (Board) from October and December 2010, and September 2014, rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO).
In January 2014, the Board remanded the claims of entitlement to an increased rating for PTSD and entitlement to service connection for a heart condition other than atrial fibrillation, for additional development. The Board also remanded the issues of entitlement to service connection for a right knee disorder, for hypertension, and for heart disease. Service connection for these claims was granted in October 2014 and March 2015 rating decisions; these issues are thus no longer on appeal. See Grantham v. Brown, 114 F.3d 1156, 1158 (Fed. Cir. 1997).
While these claims were being developed on remand, in a September 2014 rating decision, the RO assigned separate 30 percent and 10 percent ratings for diabetic nephropathy and for cataracts with mild retinopathy, right eye, respectively. The effective date of the ratings was July 1, 2013. The Veteran appealed the decision, arguing that the effective date for the grant of service connection for these disabilities should be earlier.
In a January 2016 rating decision, the RO assigned an effective date of June 13, 2012, for the award of service connection for cataracts with mild retinopathy, right eye. The Veteran was assigned a noncompensable rating for this condition until the originally assigned 10 percent rating applied in July 1, 2013. In March 2016, the Veteran perfected his appeal for the earlier effective date claims.
These claims all were before the Board in November 2016. Then, they were remanded because the Veteran had requested a local hearing with a Decision Review Officer. The Veteran’s representative withdrew the request for a hearing in a November 2016 submission. 
Finally, the Board reflects that the Veteran did perfect an appeal of entitlement to a total disability rating based on individual unemployability (TDIU) in a June 2018 VA Form 9. However, also in June 2018, the Veteran elected to participate in VA’s Rapid Appeals Modernization Program (RAMP). Accordingly, the Board does not have jurisdiction over the claim of entitlement to a TDIU at this time. 
1. Duties to Notify and Assist
Neither the Veteran nor his representative has raised any issues with the duty to notify or duty to assist. See Scott v. McDonald, 789 F.3d 1375, 1381 (Fed. Cir. 2015) (holding that “the Board’s obligation to read filings in a liberal manner does not require the Board... to search the record and address procedural arguments when the veteran fails to raise them before the Board”); Dickens v. McDonald, 814 F.3d 1359, 1361 (Fed. Cir. 2016) (applying Scott to a duty to assist argument).
2. Entitlement to service connection for heart disease other than atrial fibrillation with left ventricular hypokinesis, to include secondary to herbicide exposure and secondary to service-connected diabetes mellitus, type II. 
Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C. §§ 1110, 1131 (2012); 38 C.F.R. § 3.303(a) (2018). To establish a right to compensation for a present disability, a Veteran must show: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service - the so-called “nexus” requirement. Holton v. Shinseki, 557 F.3d 1362, 1366 (Fed. Cir. 2009) (quoting Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004)). Service connection may be granted for any disease initially diagnosed after discharge when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d) (2017).
A Veteran who served in the Republic of Vietnam during the Vietnam era is presumed to have been exposed during to an herbicide agent, unless there is affirmative evidence to the contrary. 38 C.F.R. § 3.307(a)(6)(iii). The Vietnam era is the period beginning on February 28, 1961 and ending on May 7, 1975 for veterans who served in the Republic of Vietnam, and the period beginning on February 28, 1961 and ending on May 7, 1975, in all other cases. 38 U.S.C. § 101(29)(A). Service in the Republic of Vietnam is “service in the waters offshore and service in other locations if the conditions of service involved duty or visitation in the Republic of Vietnam.” 38 C.F.R. § 3.307(a)(6)(iii). VA has interpreted this regulation to require “the service member’s presence at some point on the landmass or the inland waters of Vietnam” for entitlement to a presumption of exposure to Agent Orange. Haas v. Peake, 525 F.3d 1168, 1197 (Fed. Cir. 2008), cert. denied, 129 S.Ct. 1002 (2009). 
The Veteran had service in the Republic of Vietnam during the Vietnam era and is thus presumed to have been exposed to Agent Orange during his service. 
For veterans presumed to have been exposed to herbicides, certain enumerated diseases shall be service connected even though there is no record of such disease during service, so long as the requirements of 38 U.S.C. § 1116 and 38 C.F.R. § 3.307(a)(6)(iii) are met, and the rebuttable presumption provisions of 38 U.S.C. § 1113 and 38 C.F.R. § 3.307(d) are also satisfied. 38 C.F.R. § 3.309(e). The enumerated diseases which are deemed to be associated with herbicide exposure include ischemic heart disease. 38 C.F.R. § 3.309(e).
If a veteran was exposed to Agent Orange during active service, service connection is presumed for the following disorders: chloracne or other acneform disease consistent with chloracne; type 2 diabetes; Hodgkin’s disease; Chronic lymphocytic leukemia (CLL); multiple myeloma; Non-Hodgkin’s lymphoma; early onset peripheral neuropathy; porphyria cutanea tarda; prostate cancer; respiratory cancers (cancer of the lung, bronchus, larynx, or trachea); and soft-tissue sarcoma (other than osteosarcoma, chondrosarcoma, Kaposi’s sarcoma, or mesothelioma). 38 C.F.R. § 3.309(e).
A presumption of service connection based on exposure to herbicides used in the Republic of Vietnam during the Vietnam era is not warranted for: hepatobiliary cancers; nasal and/or nasopharyngeal cancer; bone and joint cancer; breast cancer; female reproductive cancers; urinary bladder cancer; renal cancer; testicular cancer; leukemia, other than chronic lymphocytic leukemia (CLL); abnormal sperm parameters and infertility; Parkinson’s Disease and Parkinsonism; Amyotrophic Lateral Sclerosis (ALS); chronic persistent peripheral neuropathy; lipid and lipoprotein disorders; gastrointestinal and digestive disease including liver toxicity; immune system disorders; circulatory disorders; respiratory disorders (other than certain respiratory cancers); skin cancer; cognitive and neuropsychiatric effects; gastrointestinal tract tumors; brain tumors; AL amyloidosis (also referred to as primary amyloidosis); endometriosis; adverse effects on thyroid homeostasis; and, any other condition for which VA has not specifically determined a presumption of service connection is warranted. See Diseases Not Associated with Exposure to Certain Herbicide Agents, 68 Fed. Reg. 27,630 (May 20, 2003); Diseases Not Associated with Exposure to Certain Herbicide Agents, 67 Fed. Reg. 42,600 (June 24, 2002); Diseases \Associated with Exposure to Certain Herbicide Agents; Type 2 Diabetes, 66 Fed. Reg. 2,376 (Jan. 11, 2001); Diseases Not Associated with Exposure to Certain Herbicide Agents, 64 Fed. Reg. 59,232 (November 2, 1999).
Initially, the Board notes that the Veteran is presently service-connected for atrial fibrillation with left ventricular hypokinesis. In the January 2014 remand, the Board raised the issue of service connection for a heart disease other than atrial fibrillation on account of the evidence of record potentially suggesting that the Veteran had coronary artery disease. If the Veteran does have coronary artery disease, service connection is warranted on a presumptive basis. 38 C.F.R. §§ 3.307, 3.309.
The Veteran underwent an exercise stress test in September 2004 due to, in part, suspected coronary artery disease. The testing showed normal left ventricular cavity size that did not change with exercise. There was a small, predominantly fixed defect in the inferior region of mild severity. The test was clinically negative for induced symptoms of ischemia. The nuclear images demonstrated defects consistent with infarction but no ischemia. Private treatment records from July 2005 indicated that 24 hour Holter Monitor testing showed atrial fibrillation with good heart rate control. 
In a March 2010 statement, the Veteran’s treating physician since 1969 indicated that the Veteran had a medical history that included atrial fibrillation. No other heart disease was mentioned. 
A May 2010 private treatment record shows an assessment of coronary artery disease but an impression of atrial fibrillation. Private treatment records from September 2010 showed a diagnosis history of atrial fibrillation, but no other heart disease. 
A September 2010 VA examination report showed the examiner was unable to conclude with the evidence at hand that the Veteran has coronary artery disease. She indicated that the abnormal stress test does not definitely conclude that he has coronary artery disease. 
The Veteran underwent an exercise stress echocardiogram with VA in October 2010. The test showed abnormal resting left ventricular systolic function with severe hypokinesis to akinesis of basilar inferior segment with preserved ejection fraction of 65 percent and abnormal exercise stress echo with hypokinesis to akinesis of basilar inferior segment suggestive of scar at good work load 
In a November 2010 addendum, a VA examiner was unable to conclude with the evidence at hand that the Veteran has coronary artery disease. The October 2010 abnormal stress test did not definitively conclude that the Veteran has coronary artery disease. There was no evidence of a myocardial infarction on echocardiogram. 
In a May 2014 VA examination, the examiner diagnosed the Veteran with supraventricular arrhythmia and resting ventricular dysfunction with hypokinesis. The Veteran did not have myocardial infarction or congestive heart failure. In response to the directives of the January 2014 Board remand, the examiner explained that the Veteran did in fact have a heart condition other than atrial fibrillation. Testing evidence indicated severe resting left ventricular dysfunction with preserved ejection fraction. Coronary artery disease was not diagnosed at the May 2014 VA examination. In a separate disability benefits questionnaire, the examiner opined that the Veteran did not have ischemic heart disease. He explained that there was no indication of any pharmacotherapy for any condition which meets the VA definition of ischemic heart disease. 
The VA treatment records do not show a heart condition other than atrial fibrillation with left ventricular hypokinesis. The VA examinations similarly show no heart disorder other than atrial fibrillation with left ventricular hypokinesis. The Board accords the May 2014 VA examination findings significant probative weight. The examiner demonstrated a thorough knowledge of the Veteran’s medical history and supported his findings with adequate rationale. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 302-04 (2008) (noting that the central issue is whether the examiner was informed of the relevant facts in rendering a medical opinion); Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007) (stating that a medical opinion must clearly consider direct service connection and support its conclusion with an analysis that the Board can consider and weigh against contrary opinions); Prejean v. West, 13 Vet. App. 444, 448-9 (2000) (holding that factors for assessing the probative value of a medical opinion are the physician’s access to the claims file and the thoroughness and detail of the opinion). 
The evidence supports a finding that there are no heart disorders other than the conditions for which service connection is already met. Thus, the Board finds that there is not a current disability for a heart condition other than atrial fibrillation with left ventricular hypokinesis. See Holton, 557 F.3d at 1366; 38 C.F.R. § 3.303(d). Because the threshold issue of present disability is not met, further discussion of the other elements for service connection is not necessary. 
To the extent this appeal has been pursued, the Veteran is claiming that he has a heart disorder other than his currently service connected atrial fibrillation with left ventricular hypokinesis. Although it is error to categorically reject a lay person as competent to diagnose a condition, not all such questions are subject to non-expert opinion. Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009). Whether a layperson is competent to provide a diagnosis depends on the facts of the particular case. “Lay evidence can be competent and sufficient to establish a diagnosis of a condition when (1) a layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional.” Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). Lay witnesses are competent to report that which they have observed with their own senses. See Layno v. Brown, 6 Vet. App. 465, 469 (1994). But here, the specific etiology of an endocrine disorder, which is an internal medical process not capable of lay observation, is clearly distinguishable from ringing in the ears, a broken leg, or varicose veins. See Jandreau, 492 F.3d at 1377 ; Barr v. Nicholson, 21 Vet. App. 303, 310 (2007); Charles v. Principi, 16 Vet. App. 370, 374 (2002). Regardless, the Veteran’s assertions are outweighed by the medical evidence of record, which is more probative as it is based upon medical expertise.
In summary, the most probative evidence demonstrates that there is no heart disability other than atrial fibrillation and left ventricular hypokinesis. In the absence of a present disability, entitlement to service connection for heart disease other than atrial fibrillation with left ventricular hypokinesis is not warranted. In reaching this decision the Board considered the doctrine of reasonable doubt, however, as the preponderance of the evidence is against the Veteran’s claim, the doctrine is not for application. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 
3. Entitlement to an initial rating in excess of 50 percent for posttraumatic stress disorder (PTSD).
Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Schedule), found in 38 C.F.R. Part 4 (2017). The Schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C. § 1155; 38 C.F.R. § 4.1 (2018). Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2017). When reasonable doubt arises as to the degree of disability, such doubt will be resolved in the Veteran’s favor. 38 C.F.R. § 4.3 (2018).
In considering the severity of a disability, it is essential to trace the medical history of the Veteran. 38 C.F.R. §§ 4.1, 4.2, 4.41 (2018). Consideration of the whole-recorded history is necessary so that a rating may accurately reflect the elements of any disability present. 38 C.F.R. § 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991). Although the regulations do not give past medical reports precedence over current findings, the Board is to consider the Veteran’s medical history in determining the applicability of a higher rating for the entire period in which the appeal has been pending. Powell v. West, 13 Vet. App. 31, 34 (1999).
Where entitlement to compensation has been established and an increase in the disability rating is at issue, the present level of disability is of primary concern. Francisco v. Brown, 7 Vet. App. 55, 58 (1994). Where an appeal is based on an initial rating for a disability, however, evidence contemporaneous with the claim and the initial rating decision are most probative of the degree of disability existing when the initial rating was assigned and should be the evidence “used to decide whether an original rating on appeal was erroneous.” Fenderson v. West, 12 Vet. App. 119, 126 (1999). In either case, if later evidence indicates that the degree of disability increased or decreased following the assignment of the initial rating, staged ratings may be assigned for separate periods of time. Fenderson, 12 Vet. App. at 126; Hart v. Mansfield, 21 Vet. App. 505 (2007) (noting that staged ratings are appropriate whenever the factual findings show distinct time periods in which a disability exhibits symptoms that warrant different ratings). When adjudicating a claim for an increased initial evaluation, the relevant time period is from the date of the claim. Moore v. Nicholson, 21 Vet. App. 211, 215 (2007), rev’d in irrelevant part, Moore v. Shinseki, 555 F.3d 1369 (2009). 
The Veteran submitted a claim of entitlement to service connection for PTSD in June 2010. Since then, he has been evaluated under under 38 C.F.R. § 4.130, DC 9411. Under this code, a 50 percent evaluation contemplates occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. 
A 70 percent rating is warranted when there is occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, and mood, due to such symptoms as: suicidal ideations; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); and the inability to establish and maintain effective relationships. 
A 100 percent rating is warranted if there is total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; gross inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation or own name. 
The symptoms recited in the criteria in the rating schedule for evaluating mental disorders are “not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating.” Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). “[A] veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration.” Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013). The symptoms shall have caused occupational and social impairment in most of the referenced areas. Vazquez-Claudio, 713 F.3d 112. When evaluating a mental disorder, the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the veteran’s capacity for adjustment during periods of remission must be considered. 3 8 C.F.R. § 4.126. In addition, the evaluation must be based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner’s assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126.
Effective August 4, 2014, VA amended the portion of its Schedule for Rating Disabilities dealing with mental disorders to remove outdated references to the DSM-IV and replace them with references to the DSM-5. See 79 Fed. Reg. 45,093, 45,094 (Aug. 4, 2014). VA adopted as final, without change, the interim final rule and clarified that the provisions of the final rule did not apply to claims that were pending before the Board, this Court, or the U.S. Court of Appeals for the Federal Circuit on August 4, 2014, even if such claims were subsequently remanded to the agency of original jurisdiction. See 80 Fed. Reg. 14,308 (Mar. 19, 2015). In Golden v. Shulkin, No. 16-1208, Slip opinion at 5 (Vet. App. Feb. 23, 2018), the Court held that given that the DSM-5 abandoned the GAF scale and that VA has formally adopted the DSM-5, the Board errs when it uses GAF scores to assign a psychiatric rating in cases where the DSM-5 applies. This appeal was originally certified to the Board prior to August 4, 2014. As such, the DSM-IV applies and the GAF scores will be noted.
When it is not possible to separate the effects of the service-connected condition and the non-service-connected condition or conditions, VA regulations clearly dictate that such signs and symptoms be attributed to the service-connected condition. See Mittleider v. West, 11 Vet. App. 181, 182 (1998). Although the Veteran has received a diagnosis of depression throughout the appeal, this diagnosis is not provided in every VA examination and the symptoms are not consistently delineated. That is, other medical professionals have not made a clear distinction. Consequently, the Board shall consider all the Veteran’s psychiatric symptoms in assigning a rating for the PTSD. See Mittleider at 182.
 Factual History
The Veteran presented for an initial evaluation for PTSD in August 2010. The Veteran was retired but described a positive work history with no write ups. The Veteran had married in October 1969 and had remained married until his wife passed away two years earlier due to cancer. Their relationship was described a strong and wonderful, and he related that his wife had encouraged him to seek service connection for PTSD because she had recognized multiple mood shifts. The Veteran had one son who was married with children. The Veteran’s relationship with his son was described as very good. The Veteran also had close relationships with friends with whom he’d ride motorcycles. He stated that his friends would sometimes friends will make comments as to why the Veteran always needed to sit with his back facing the door and closest to the exit. 
Regarding activities and leisure pursuits, the Veteran described enjoying motorcycle riding, spending time with his on and grandchildren, working out, feeding the horses, and taking his dog for a walk. A mental status examination was normal, though the Veteran was noted to become tearful multiple times during the examination when discussing his experiences in Vietnam and losses related to his service. His mood was good, and attention, concentration, and memory were intact. The Veteran denied having delusions, hallucinations, or homicidal ideation. The Veteran did report that he had thoughts of suicide when his wife passed away approximately two years earlier. There was no intent or plan to act, and the Veteran indicated that he had too many things to look forward to. He denied any past suicidal attempts. 
The Veteran described a history of feeling depressed for approximately one week. Such episodes would last four to five days. He would lose interest or pleasure in things that he does. The Veteran did not have much energy, he had psychomotor retardation, and he had senses of guilt. The examiner noted that the Veteran had low concentration and that he may have thoughts of suicide without any intent or plan to act. 
The Veteran described re-experiencing symptoms such as unwanted memories, causing moderate distress. He also described experiencing the same nightmare of an in-service event several times per week, causing him to become emotional and cry upon awakening. His sleep habits had consequently suffered. The Veteran next indicated that he had become emotionally upset once or twice over the past month. The Veteran also described avoidance symptoms, resulting in moderate difficulty in his functioning. He indicated that he felt distant and cut off from other people, in particular not wanting to talk with anyone from other people, sometimes turning off his phone for days at a time. He described feeling emotionally numb and having difficulty experiencing feelings such as happiness. The Veteran also described hyperarousal symptoms such as difficulty sleeping, feeling irritable and angry almost every day, finding it difficult to concentrate on things due to being alert and on guard most of the day. He stated that it takes about an hour to fall asleep and he would awaken two to three times per night, taking approximately one to two hours to fall back asleep. He would sleep five to six hours per night. 
When irritable, he would go lift weights or go for a walk rather than act out. In the past, he would blow up and yell, but he reported that he would perform some activity to work out his feelings currently. He would sleep on alert at night with his gun loaded next to his bed. He would sit in certain places in the restaurant with his back to the wall. He described mild to moderate distress over the previous month, which had moderately impacted his ability to engage in relationships and mildly impacted other aspects of his life. The examiner diagnosed PTSD with mild to moderate severity. The severity seemed to have been more severe 15 to 20 years earlier, but there was still mild to moderate impairment related to PTSD. Currently, his functioning was mildly to moderately affected by his symptoms. The Veteran also had a history of depressive symptoms, but these symptoms did not appear to cause significant disruption in his life currently. A GAF score of 61 was assigned. A diagnosis of major depression in full remission was also provided. 
VA provided another examination in April 2014. At that time, the examiner diagnosed PTSD and unspecified depressive disorder. The Veteran reported that he still thinks about his time in Vietnam on a daily basis, has intense psychological reactions to trauma triggers, ongoing nightmares, and a range of avoidance, hyperarousal, and negative alteration of mood and cognition symptoms. The Veteran also reported ongoing problems with irritability that affected his current relationship and motivating him to possibly pursue mental health treatment to address his symptoms. Regarding his depressive disorder, the Veteran reported that he had experienced episodic depressive symptomatology since his return from Vietnam. He recounted one instance years previously where he had contemplated suicide with a gun in his hand. However, his grandchildren were a deterrent to ever acting on these thoughts. The Veteran reported that over the years he would have some months with no depressive symptoms, but then he would have two to three episodes where he would not care about anything. He also reported sleep and concentration disturbances, but the examiner noted that these symptoms were chronic and most likely attributable to his PTSD diagnosis. When asked to distinguish symptoms attributable to each psychiatric diagnosis, the examiner indicated that the re-experiencing symptoms, avoidance, and hyperarousal symptoms were related to the Veteran’s PTSD. The transient depressed mood, acute and transient amotivation, and occasional suicidal ideation were attributable to the Veteran’s unspecified depression diagnosis. The majority of occupational and social impairment were attributable to the Veteran’s PTSD, and the examiner found that there was occupational and social impairment with occasional decrease in work efficiency and intermittent periods of the inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care, and conversation. 
Since his initial examination in 2010, the Veteran had not received any psychiatric treatment. Over the previous year and a half, the Veteran had been dating a woman. He visited his dating interest occasionally in Florida, but the Veteran’s irritability was jeopardizing this relationship, motivating the Veteran to possibly pursue mental health treatment. The Veteran had many local friends. He had maintained a close friendship with another veteran who served with him in Vietnam. The Veteran was also in a group of veterans who rode motorcycles together and perform service work for other veterans. The Veteran had retired, but he previously worked for a defense company. He described work as his therapy. Symptoms attributable to the Veteran’s diagnoses were depressed mood, anxiety, chronic sleep impairment, mild memory loss, such as forgetting names, directions, or recent events, impairment of short and long term memory, such as retention of only highly learned material, while forgetting to complete tasks, disturbances of motivation and mood, and suicidal ideation. 
A June 2017 VA treatment record shows that the Veteran’s relationship with his girlfriend was going well. He was experiencing an increase in nightmares over the last several months, sometimes as much as two per week. These were not consistent, however. He would awaken while striking out, yelling, and in a sweat. He reported an increased stress over the last several months in deciding whether he would move back to Connecticut from Florida, which may be related to the increase in his nightmares. The Veteran reported that the problem was not interfering enough to using medications. 
VA provided an examination in March 2018. Then, the Veteran was only diagnosed with PTSD. The examiner found that the Veteran’s PTSD resulted in occupational and social impairment with occasional decrease in work efficiency and intermittent periods of the inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care, and conversation. Since his last examination, the Veteran had moved in with his girlfriend of four years. The Veteran kept busy exercising and going to the gym. He also would ride his motorcycle. The Veteran would go out to eat and see movies with his girlfriend. He also socialized with friends on occasion. The Veteran expressed interest in joining an animal rescue group or a group to help veterans. The Veteran was not currently in mental health care and had not sought mental health care in the previous year or so. He did see a VA counselor for individual counseling, and he did try medication. However, he did not like the side effects of the medication so he ceased use. The Veteran reported that his main symptoms of PTSD were that he is quick to anger, irritable, and he could be sarcastic or nasty at times. He would yell when angry, and he had punched walls in the past. Symptoms attributed to the Veteran’s PTSD were depressed mood, anxiety, suspiciousness, chronic sleep impairment, mild memory loss, such as forgetting names, directions, or recent events, disturbances of motivation and mood, suicidal ideation, and impaired impulse control, such as unprovoked irritability with periods of violence. The Veteran denied any current thoughts, plans, or intent of suicide or violence toward others. He reported that he used to think of suicide in the past, but he would always think of what it would do to his son or grandchildren, and the thoughts would pass. 
 Analysis
After a thorough review of the record, the Board finds that an initial disability rating in excess of 50 percent for the Veteran’s service-connected PTSD is not warranted. 
Throughout the appeal, the Veteran has described having what appear to be healthy relationships with friends and family members. For the majority of the appeal, he has cultivated a relationship with his current girlfriend. Though he has periods of anger and irritability, he demonstrates that he maintains an active social and familial life. Further, the Veteran reported consistently that he would exercise in a gym.
At the August 2010 VA examination, the Veteran described having an active life with multiple hobbies. The mental status examination was normal, though the Veteran did become emotional when describing his Vietnam experiences. The Veteran also related that he considered suicide two years earlier, when his wife passed away. However, he denied any intent or plan. He reported episodic depressive episodes. Other symptoms included nightmares, sleep difficulties, mood swings, avoidance, emotional numbness, and hypervigilance. Of note, the examiner categorized the Veteran’s PTSD as mild to moderate and assigned a GAF score of 61, explaining that the Veteran’s symptoms seemed to have been more severe 15 to 20 years earlier. This examination does not demonstrate disability approximating occupational and social impairment in most areas. While a past history of suicidal ideation was noted, the Veteran denied current ideation, and the one episode noted seemed to be in reference ot the Veteran’s wife’s death prior to the instant appeal. 
Similar symptoms were noted in the April 2014 VA examination. The main symptoms identified were depressed mood, anxiety, chronic sleep impairment, mild memory loss, such as forgetting names, directions, or recent events, impairment of short and long term memory, such as retention of only highly learned material, while forgetting to complete tasks, disturbances of motivation and mood, and suicidal ideation. Again, suicidal ideation was noted. However, this symptom was identified due to the Veteran’s report that he had considered suicide on one occasion in years past. Again, the Veteran did not indicate that he had difficulties with suicidal thoughts during the instant appeal and nothing from this examination would support such a finding. The examiner found that the Veteran’s PTSD resulted in occupational and social impairment with occasional decrease in work efficiency and intermittent periods of the inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care, and conversation. This does not suggest occupational and social impairment with deficiencies in most areas. 
On VA examination in March 2018, the same level of occupational impairment was noted. Symptoms identified then were depressed mood, anxiety, suspiciousness, chronic sleep impairment, mild memory loss, such as forgetting names, directions, or recent events, disturbances of motivation and mood, suicidal ideation, and impaired impulse control, such as unprovoked irritability with periods of violence. Again, suicidal ideation, but this was due to the Veteran’s report that he had instances of suicidal ideation in the past. The examiner also noted that there was impaired impulse control, seemingly due to the Veteran’s report that he would become angry and had punched walls in the past. The examination did not show that there were current episodes of impaired impulse control. 
In short, though noted on examinations, the evidence does not demonstrate suicidal ideations during the appeal. Similarly, the evidence does not demonstrate obsessional rituals which interfere with routine activities, speech intermittently illogical, obscure, or irrelevant, near-continuous panic or depression affecting the ability to function independently, appropriately and effectively, spatial disorientation, neglect of personal appearance and hygiene, difficulty in adapting to stressful circumstances (including work or a worklike setting), and the inability to establish and maintain effective relationships. As noted above, though the March 2018 VA examiner reported impaired impulse control, this symptom was noted in relation to the Veteran’s report of past behavior. Again, the August 2010 VA examiner noted that the Veteran’s PTSD appeared to be worse 15 to 20 years earlier. During the instant appeal, however, his symptoms do not approximate occupational and social impairment with deficiencies in most areas. 
Because the evidence does not demonstrate occupational and social impairment with deficiencies in most areas, the Board finds that a higher 70 percent evaluation is not warranted. The Board finds that there is not such an approximate balance of the positive evidence and the negative evidence to permit a favorable determination. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 
4. Entitlement to an earlier effective date than June 13, 2012, for the grant of separate service connection for cataracts with mild retinopathy, right eye. 
The Veteran seeks an effective date earlier than June 13, 2012, for the grant of service connection for cataracts with mild retinopathy, right eye. During a claim for a higher rating for diabetes, the Veteran submitted a statement on July 1, 2013, requesting compensation for erectile dysfunction as secondary to the Veteran’s service-connected diabetes, “along with any other complications related to the systemic disease manifested by the body’s inability [to] properly regulate blood sugar.” 
In his November 2014 Notice of Disagreement, the Veteran indicated that the July 2013 statement was merely the first time that his claim for these conditions were more specific and that he had been seeking compensation for diabetic related conditions earlier than July 2013. 
Generally, the effective date of an award of disability compensation based on an original claim shall be the date of receipt of the claim or the date entitlement arose, whichever is later. 38 U.S.C. § 5110 (a) (2012); 38 C.F.R. § 3.400 (2018). The date of entitlement is not defined in the current statute or regulation. However, it is the date when the claimant met the requirements for the benefits sought, which is determined on a facts found basis. 38 U.S.C. § 5110 (a); McGrath v. Gober, 14 Vet. App. 28, 35 (2000). An effective date generally can be no earlier than the facts found. DeLisio v. Shinseki, 25 Vet. App. 45 (2011). These facts found include the date the disability first manifested and the date entitlement to benefits was authorized by law and regulation. See generally 38 C.F.R. § 3.400. For instance, if a claimant filed a claim for benefits for a disability before he actually had the disability, the effective date for benefits can be no earlier than the date the disability first manifested. Ellington v. Peake, 541 F.3d 1364, 1369-70 (Fed. Cir. 2008). 
With regard to the date of claim, prior to March 24, 2015, a claim is defined as a formal or informal communication in writing requesting a determination of entitlement, or evidencing a belief in entitlement, to a benefit. 38 C.F.R. § 3.1 (p). Any communication or action that (1) indicates an intent to apply for one or more VA benefits and (2) identifies the benefit sought may be considered an informal claim. 38 C.F.R. § 3.155 (a). When determining the effective date of an award of compensation benefits, VA must review all the communications in the file, after the last final disallowance of the claim that could be interpreted to be a formal or informal claim for benefits. Servello v. Derwinski, 3 Vet. App. 196, 198 (1992). 
VA must look to all communications from a Veteran which may be interpreted as applications or claims - formal and informal - for benefits. VA has a duty to fully and sympathetically develop the Veteran’s claim to its optimum, which includes determining all potential claims raised by the evidence and applying all relevant laws and regulations. Harris v. Shinseki, 704 F.3d 946, 948-49 (Fed. Cir. 2013); Szemraj v. Principi, 357 F.3d 1370, 1373 (Fed. Cir. 2004); Moody v. Principi, 360 F.3d 1306, 1310 (Fed. Cir. 2004); Roberson v. Principi, 251 F.3d 1378 (Fed. Cir. 2001). 
Additionally, with regard to compensation for disabilities for which service connection was granted on a secondary basis, the effective date can be no earlier than the date of the claim for service connection on a secondary basis. Ellington v. Nicholson, 22 Vet. App. 141, 145 (2007) (finding that the effective date for a grant of service connection for diabetes and hypertension as secondary to leukemia was the date of the claim for secondary service connection, not the date of the claim of service connection for leukemia), aff’d sub nom. Ellington v. Peake, 541 F.3d 1364 (Fed. Cir. 2008); Ross v. Peake, 21 Vet. App. 528, 532-33 (2008) (holding that the effective date for a grant of secondary service connection for depression with anxiety was the date of the secondary service connection claim, not the date of the claim for service connection for the primary heart condition).
Service connection is in effect for the Veteran’s service-connected cataracts with mild retinopathy, right eye, from June 13, 2012. For an earlier effective date to be warranted, the evidence must demonstrate that the entitlement arose prior to that date and that there was a pending claim. Because service connection is in effect for the Veteran’s diabetes from June 13, 2010, an effective date earlier than that date for the secondarily related cataracts with retinopathy is not possible. 
The Board finds that there is no communication that may be construed as an informal or formal claim for service connection benefits for the Veteran’s cataracts with retinopathy until July 1, 2013. At that time, the Veteran requested compensation for erectile dysfunction as secondary to the Veteran’s service-connected diabetes, “along with any other complications related to the systemic disease manifested by the body’s inability [to] properly regulate blood sugar.” The only prior communication relating to a secondary condition from the Veteran’s diabetes was received in May 30, 2012. At that time, the Veteran reported that he now required medication for erectile dysfunction as a result of his diabetes. This statement may not be construed as an informal claim for service connection for cataracts with retinopathy because it does not identify the benefit sought. 
Therefore, the Board finds that the date of the claim for the Veteran’s claim of entitlement to service connection for cataracts with retinopathy is July 1, 2013. There is no communication of record prior to that date that may be construed as a formal or informal claim for this benefit. The effective date for service connection is the date of receipt of the claim or the date entitlement arose, whichever is later. The RO assigned an effective date of June 13, 2012, which is before the date of the claim. Thus, an earlier effective date for the award of service connection is not warranted. 
5. Entitlement to an earlier effective date than July 1, 2013, for the grant of a separate evaluation for diabetic nephropathy.
The Veteran seeks an effective date earlier than July 1, 2013, for the grant of a separate evaluation for diabetic nephropathy. 
During a claim for a higher rating for diabetes, the Veteran submitted a statement on July 1, 2013, requesting compensation for erectile dysfunction as secondary to the Veteran’s service-connected diabetes, “along with any other complications related to the systemic disease manifested by the body’s inability [to] properly regulate blood sugar.” 
In his November 2014 Notice of Disagreement, the Veteran indicated that the July 2013 statement was merely the first time that his claim for these conditions were more specific and that he had been seeking compensation for diabetic related conditions earlier than July 2013. 
As mentioned above, the appropriate effective date for the award of service connection based on an original claim is the date of receipt of the claim or the date entitlement arose, whichever is the later. 38 U.S.C. § 5110 (a); 38 C.F.R. § 3.400. 
Different rules apply to increased ratings. If the increase occurred within one year prior to the claim, the increase is effective as of the date the increase was “factually ascertainable.” If the increase occurred more than one year prior to the claim, the increase is effective the date of claim. If the increase occurred after the date of claim, the effective date is the date of increase. 38 U.S.C. 5110 (b)(2) (2012); Harper v. Brown, 10 Vet. App. 125 (1997); 38 C.F.R. 3.400 (o)(1)(2) (2018); VAOPGCPREC 12-98 (1998).
Here, the separate rating for nephropathy was granted on the basis of the rating criteria for diabetes mellitus. Service connection was granted for diabetes mellitus with nephropathy in an October 2010 rating decision. The Veteran had a pending claim for an increased rating for diabetes mellitus on July 1, 2013. As such, the effective date may be determined under the criteria applicable to increased ratings. See 38 C.F.R. § 4.119, Diagnostic Code 7913 (2017) (providing that separate ratings are to be provided for each compensable manifestation of diabetes).
Renal involvement in diabetes mellitus is rated under 38 C.F.R. § 4.115b, Diagnostic Code 7541. This code directs that nephropathy be rated as renal dysfunction, which is rated under a general formula under 38 C.F.R. § 4.115a. A noncompensable rating is warranted for albumin and casts with history of acute nephritis or for hypertension that is noncompensable under Diagnostic Code 7101. A 30 percent rating is warranted for albumin that is constant or recurring with hyaline and granular casts or red blood cells, or where there is transient or slight edema or hypertension rated at least 10 percent under Diagnostic Code 7101.
Beginning with the claim date, the Veteran submitted a claim for an increased rating for diabetes mellitus on May 30, 2012. The Board will construe this statement as the claim date for effective date purposes for the Veteran’s 30 percent evaluation for nephropathy. The relevant inquiry now is when it is factually ascertainable that the Veteran’s nephropathy underwent an increase in severity. 
The earliest examination of record pertaining to nephropathy is from June 2014. Then, the examiner indicated that the evidence had shown nephropathy with microalbumin since 2010. This is finding is consistent with a September 2010 VA examination indicating that the Veteran had nephropathy with elevated microalbumin. It is factually ascertainable that a separate 30 percent evaluation was warranted for nephropathy at the time of the September 2010 VA examination, more than one year prior to the Veteran’s claim for an increased evaluation on May 30, 2012. 
Thus, the Board finds that the evidence demonstrated that a 30 percent evaluation for nephropathy was warranted more than one year prior to the receipt of the Veteran’s increased rating claim on May 30, 2012. Under such circumstances, the effective date for the separate evaluation, or the increased evaluation, is the date of the claim. 38 C.F.R. § 3.400 (o). That date is May 30, 2012. Thus, an earlier effective date of May 30, 2012, is warranted for the separate evaluation for the Veteran’s service-connected nephropathy. 
There is no evidence of an earlier claim date for the increased rating claim. As such, an effective date prior to May 30, 2012, is not warranted. 
 
KELLI A. KORDICH
Veterans Law Judge
Board of Veterans’ Appeals
ATTORNEY FOR THE BOARD Steve Ginski, Associate Counsel